# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **STEPHEN HAMMONDS,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **CIVIL ACTION NO.** |
| ] | **4:16-CV-01558-KOB** |
| **ROBERT THEAKSTON, et al.,** ] | |
| ] | |
| **Defendants.** ] | |

## <u>MEMORANDUM OPINION</u>

This § 1983 case concerns the medical care that Plaintiff Stephen Hammonds received for his diabetes while incarcerated at DeKalb County Corrections Center. Defendants Dr. Robert Theakston and Matthew Martin filed a motion for summary judgment. (Doc. 80). To resolve the motion for summary judgment, the court must analyze whether any reasonable official in the same circumstances as Dr. Theakston and Mr. Martin would have understood that administering only short-acting insulin to Mr. Hammonds, as opposed to both short-acting and long-acting insulin, violated his constitutional right to be free from the deliberate indifference to his serious medical needs. The court answers this overriding question in the negative and finds that Defendants are entitled to qualified immunity to Mr. Hammonds's § 1983 claim and grants their motion for summary judgment.

1

# I.   STANDARD OF REVIEW

A trial court can resolve a case on summary judgment only when the moving party establishes two essential elements: (1) no genuine disputes of material fact exist; *and* (2) the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

Under the first element of the moving party's summary judgment burden, "'[g]enuine disputes [of material fact] are those in which the evidence is such that a reasonable jury *could* return a verdict for the non-movant.'"  *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (emphasis added) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).  And when considering whether any genuine disputes of material fact exist, the court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

Pursuant to these rules, the court next presents the facts supported by evidence on the record in the light most favorable to Mr. Hammonds.

# II.   BACKGROUND

Mr. Hammonds suffers from type 1 diabetes mellitus.  To treat his diabetes, he regularly checks his blood glucose level and takes insulin.

On September 29, 2014, Mr. Hammonds was arrested and booked into the

DeKalb County Corrections Center. At the time of booking, he had short-acting R insulin and long-acting N insulin on his person, which the jail personnel confiscated. Short-acting R insulin counteracts the spike in glucose that occurs when eating a meal, whereas long-acting N insulin helps maintain a healthy baseline glucose level.

Dr. Theakston directed Mr. Hammonds's medical care in the jail. Dr. Theakston placed Mr. Hammonds on a regular insulin sliding scale regimen. According to this protocol, jail medical staff checked Mr. Hammonds's blood sugar at least twice a day, and, depending on his blood sugar level, administered a dosage of only short-acting R insulin, not long-acting N insulin.

According to Mr. Hammonds, the jail staff knew that he had to take both R insulin and N insulin. Mr. Hammonds testified that he told the arresting officer, the booking officer, nurses, jailers, and "everyone who would listen" that he required R insulin and N insulin. (Doc. 91-2 at 3–4).

Nurse notes taken during a prior incarceration in 2007 at the same jail shows that jail staff treated Mr. Hammonds with both R insulin and N insulin then. (Doc 82-4 at 48–50, 54–56, 62–70). A medical screening form and nurse's notes taken during a prior incarceration in 2013 show that Mr. Hammonds reported that he took both R insulin and N insulin, but that the jail staff treated him with only R insulin without issue then. (Doc. 82-4 at 72–73; Doc. 82-17 at 4–6). Dr.

Theakston was also the jail physician during those two prior incarcerations.

On October 3, 2014, Mr. Hammonds was "very sick and felt like [he] might not live." (Doc. 91-2 at 4). He called his father from jail and said that he did not think that he would survive the night.

Mr. Hammonds's mother called 911 and told the operator that Mr. Hammonds was having a medical emergency at the jail. The 911 operator called Mr. Martin, the Chief Jail Administrator, to inform him about the call. The parties paint different pictures of how Mr. Martin responded, but, for purposes of summary judgment only, the court accepts Mr. Hammonds's version of events.

According to Mr. Hammonds, Mr. Martin called Mr. Hammonds's mother back and "said he was going to make some arrests if anyone called 911 again and that he was tired of having his supper interrupted." (Doc. 91-3 at 2). Mr. Martin admonished Mr. Hammonds's mother for "misusing the 911 system," accused Mr. Hammonds of "just whining and crying and carrying on," and kept telling his mother that "someone was going to be arrested" for wrongfully calling 911. (*Id.* at 2–3; Doc. 82-46 at 10).

According to Mr. Hammonds, after the phone call, jailers took Mr. Hammonds to an empty medical ward and gave him a phone with Mr. Martin on the other line. (Doc. 91-2 at 5). Mr. Hammonds testified that Mr. Martin threatened him with solitary confinement and "four walls to complain to" if his

family called 911 again, after which "things would get worse for [him] and [his] family." (Doc. 91-2 at 5).

Two days after the 911 call, on October 5, 2014, the jail staff could not successfully treat Mr. Hammonds's high blood sugar. So Dr. Theakston ordered Mr. Hammonds to be transported to the DeKalb County Regional Medical Center emergency room.

Mr. Hammonds was hospitalized from October 5 to October 8, 2014 for diabetic ketoacidosis. The hospital treated Mr. Hammonds with IV insulin until the ketoacidosis was resolved on October 8, 2014, at which point the hospital discharged him back to the jail with instructions for the jail staff to administer 70/30 insulin (a mixture of R insulin and N insulin) twice a day, administer R insulin according to a sliding scale protocol, and call the hospital if Mr. Hammonds's blood glucose level exceeded 400 mg/dl. (Doc. 82-23 at 3; Doc. 91-1 at 63).

The jail followed the hospital's discharge instructions and administered 70/30 insulin twice a day from October 8, 2014 until Mr. Hammonds's release from jail on October 16, 2014. (Doc. 82-15 at 2). But the jail did not perfectly follow the hospital's regular insulin sliding scale during those eight days. Mr. Hammonds twice had a blood glucose level exceeding 400 mg/dl. According to the hospital's sliding scale, someone at the jail should have called the hospital for

such a high level, but nobody ever did. And medical records show that, sometimes during Mr. Hammonds's last eight days at the jail, the jail staff gave Mr. Hammonds a dose of R insulin smaller or larger than the dose required by the hospital's sliding scale. (*See* Doc. 82-15 at 2; Doc. 91-1 at 30–32, 63).

Mr. Hammonds alleges that the diabetic ketoacidosis that he suffered at the jail caused the diabetic peripheral neuropathy from which he now suffers. Disputed evidence on the record shows that diabetic ketoacidosis *can* cause diabetic peripheral neuropathy.

Mr. Hammonds brings a § 1983 claim against Dr. Theakston and Mr. Martin in their individual capacities, alleging that they violated his Fourteenth Amendment right to be from the deliberate indifference to his serious medical needs and caused his diabetic peripheral neuropathy. Mr. Hammonds attributes all of the medical care he received to Dr. Theakston and asserts that Mr. Martin's supervision and policies engendered the allegedly unconstitutional medical care. Mr. Hammonds also asserts that Mr. Martin was deliberately indifferent to his serious medical needs by threatening him and his family for calling 911.

Dr. Theakston and Mr. Martin move for summary judgment on two grounds, asserting that (1) no genuine dispute exists as to whether they are entitled to qualified immunity; and (2) no substantial evidence exists to show a causal link between the alleged constitutional violations and Mr. Hammonds's continuing

injuries. For the following reasons, the court will grant their motion for summary judgment on grounds of qualified immunity and need not address the causation question.

## III. ANALYSIS

Qualified immunity protects government officials to some extent from lawsuits against them in their individual capacities. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1329 (11th Cir. 2007). To receive qualified immunity, a government officer must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Then the burden shifts to the plaintiff to show that the government officer violated his "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The parties agree that Dr. Theakston and Mr. Martin were acting within the scope of their discretionary authority when the alleged wrongful acts occurred. So the court proceeds by analyzing whether any genuine issue exists about whether the Defendants violated Mr. Hammonds's clearly established rights.

For a right to be clearly established, it must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. ---, 136 S. Ct. 305, 308 (2015) (internal

quotation omitted). The Supreme Court recently "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. ---, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Accordingly, a government officer violates clearly established law only when "the violative nature of [*his*] *particular conduct* is clearly established . . . in light of the specific context of the case." *Mullenix*, 136 S. Ct. at 308 (emphasis in original) (internal quotations omitted).

So, identifying a right that the defendant allegedly violated is not enough; rather, the plaintiff must show that "the right's contours were sufficiently definite that *any* reasonable official in the defendant's shoes would have understood" that *what he did* violated that right. *Kisela v. Hughes*, 584 U.S. ---, 138 S. Ct. 1148, 1153 (2018) (emphasis added).

Mr. Hammonds contends that Defendants violated his clearly established right to be free from the deliberate indifference to his serious medical needs under the Due Process Clause of the Fourteenth Amendment. True, when Mr. Hammonds was incarcerated, the law "clearly established that a jail official violates a pre-trial detainee's Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee."

*Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997) (*overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009)).  But, merely stating a constitutional right does not show that a right is clearly established for qualified immunity purposes; Mr. Hammonds must show how Defendants allegedly violated that right and whether reasonable officials in their position would have known that what they did violated that right.

So the court turns to the law that governs a claim of deliberate indifference to serious medical needs.  To state such a claim, a plaintiff "must shoulder three burdens." *Goebert*, 510 F.3d at 1326.  First, he must show that he had a serious medical need. *Id.* (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam)).  Next, he must show that the prison official acted with deliberate indifference to his serious medical needs. *Goebert*, 510 F.3d at 1326.  Finally, he must show that the defendant's wrongful conduct caused him injury. *Id.* (citing *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995)).

For purposes of their motion for summary judgment only, Defendants concede that Mr. Hammonds had a "serious medical need" because of his diabetes to satisfy the objective component of a deliberate indifference claim.  (*See* Doc. 81 at 20).  So the court turns to Mr. Hammonds's second burden; *i.e.*, to satisfy "the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need." *Goebert*, 510 F.3d at 1326.

The subjective component of a claim of deliberate indifference to medical needs itself requires three elements: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than [gross] negligence." *Goebert*, 510 F.3d at 1327 (alteration in original). Though "[t]he meaning of 'more than gross negligence' is not self-evident," the Eleventh Circuit's "past decisions have developed the concept." *Id.*

For example, medical treatment is "more than gross negligence" when "'it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). A medical provider commits more than gross negligence if he refuses to obtain treatment, delays treatment, or provides care "'which is so cursory as to amount to no treatment at all.'" *Nam Dang*, 871 F.3d at 1280 (quoting *Lancaster*, 116 F.3d at 1425, and *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)) (citing *Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994)). And "grossly inadequate care as well as . . . a decision to take an easier but less efficacious course of treatment" may also constitute conduct that is more than gross negligence. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

Also, the plaintiff must demonstrate that his medical care provider's actions

"violated a clear and specific standard and that similarly situated reasonable health care providers would have known that their actions violated [the plaintiff's] constitutional right." *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). The plaintiff can show the existence of a clearly established medical standard "either through reference to prior court decisions or to the contemporary standards and opinions of the medical profession." *Id.* But the Eleventh Circuit has cautioned that, though "this inquiry may sound in medical malpractice, a plaintiff must demonstrate more than mere negligence . . . to assert a[ Fourteenth Amendment] violation." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Only "'obduracy and wantonness, not inadvertence or error in good faith,'" in providing inmate medical care violates the Constitution. *Adams*, 61 F.3d at 1544 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

Here, Mr. Hammonds asserts that his expert witness's testimony and one prior court decision shows a clearly established medical standard to treat a patient like him with both short-acting and long-acting insulin, that the violation of such standard constitutes more than gross negligence, and that any reasonable official in Dr. Theakston's and Mr. Martin's position would have known that violating that standard would constitute deliberate indifference. Defendants have moved to exclude Mr. Hammonds's expert witness's testimony from the summary judgment record, but for purposes of summary judgment only, the court will deny

Defendants motion in limine as to Mr. Hammonds's expert and construe the expert testimony in the light most favorable to Mr. Hammonds.

Having set out the governing qualified immunity law and Mr. Hammonds's primary contentions for why Dr. Theakston and Mr. Martin should not enjoy qualified immunity, the court will separately evaluate each Defendant's arguments for qualified immunity.

### 1. *Dr. Theakston's Qualified Immunity*

Mr. Hammonds first challenges Dr. Theakston's qualified immunity with expert witness testimony.  Mr. Hammonds's expert witness, Dr. Homer Venters, is a "physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for the incarcerated"; was the Chief Medical Officer for the New York City Jail Correctional Health Service where he was "responsible for development and oversight of all health policies in the NYC jail system"; and has treated many inmates with type 1 and type 2 diabetes with various types of insulin  (Doc. 82-43 at 8–9; Doc. 82-44 at 32).

Dr. Venters testified that, in his opinion, Mr. Hammonds suffered diabetic ketoacidosis at the jail because he was not provided any long-acting insulin before he was hospitalized.  (Doc. 83-43 at 23; Doc. 82-44 at 39).  He testified, "my experience as a physician is that it is not possible to treat insulin dependent diabetes only with short-acting insulin with maybe the exception of care provided

in an intensive care unit where there's constant medical monitoring." (Doc. 82-43 at 23). He also testified that, based on his knowledge and experience with treating insulin-dependent diabetics, administering only short-acting insulin "was a gross deviation from not just a clinical standard, but just an acceptance approach to the care of the patient." (*Id.* at 21). And, as Mr. Hammonds frequently notes, Dr. Venters testified:

> A. It's my assessment that the
> failure of Dr. Theakston to assess the
> basal insulin needs of this patient and
> prescribe long-acting insulin as part of
> his regimen, represents a gross deviation
> from any standard of care I'm aware of as
> directly related to his development of
> diabetic ketoacidosis.
> . . . .
> But I have almost never seen a
> patient who is known to be insulin
> dependent be given only short-acting
> insulin, and I would -- I assess this as
> just a very gross deviation from any
> standard of care, not simply a matter of
> . . .
> the wrong medicine, or the wrong
> treatment.
> But my sense is this is no
> treatment for half the problem, and
> treatment for the other half of the
> problem.

(Doc. 82-43 at 28).

Mr. Hammonds contends that Dr. Venters's testimony alone establishes that treating type I diabetics with Mr. Hammonds's symptoms with only short-acting

insulin constitutes more than gross negligence according to well-known objective medical standards, such that similarly situated officials would have known that Dr. Theakston's treatment violated Mr. Hammonds's constitutional rights. The court disagrees.

Dr. Venters's testimony falls short of Mr. Hammonds's interpretation of it. Though the testimony *could* create a genuine dispute over the cause of Mr. Hammonds's diabetic ketoacidosis and the reasonableness of Mr. Hammonds's pre-hospitalization treatment at the jail for a negligence claim, it does *not* create a genuine dispute over what Mr. Hammonds must actually show to strip Dr. Theakston of qualified immunity.

As stated above, Mr. Hammonds must show a genuine dispute of whether the "contours" of his right to receive more than just short-acting insulin "were sufficiently definite that any reasonable official in [Dr. Theakston's] shoes would have understood" that what Dr. Theakston did violated that right, and that Dr. Theakston disregarded the risk of providing only short-acting insulin by conduct that is more than gross negligence. *See Kisela*, 138 S. Ct. at 1153; *Goebert*, 510 F.3d at 1327. Dr. Venters's testimony does not create such a genuine dispute.

Dr. Venters's testimony only shows that he has not had success treating type I diabetics with only short-acting insulin and has not seen the kind of treatment that Dr. Theakston provided. It does not show a clearly established medical standard

that required Dr. Theakston to treat Mr. Hammonds with both short-acting and long-acting insulin, and, even if such a standard existed, that Dr. Theakston's failure to meet the standard amounted to more than gross negligence. The testimony sheds no light on what any similarly situated reasonable health care providers in Dr. Theakston's position should have done, much less whether Dr. Theakston should have been aware of a substantial risk of serious harm to Mr. Hammonds.

And, even accepting Dr. Venters's opinion that Dr. Theakston only treated half of the problem as true, no evidence shows that doing so was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Nam Dang*, 871 F.3d at 1280 (citations and quotations omitted). No evidence disputes that Dr. Theakston did not refuse to treat Mr. Hammonds, delay his treatment, provide only cursory treatment as to amount to no treatment at all, or take an easier but less effacious course of treatment.

Dr. Venters's testimony might raise a genuine issue of the reasonableness of Dr. Theakston's decision to administer only short-acting insulin to support an inference of negligence. But that is not enough; only "'obduracy and wantonness, not inadvertence or error in good faith,'" in providing inmate medical care violates the Constitution. *Adams*, 61 F.3d at 1544 (quoting *Whitley*, 475 U.S. at 319). Dr.

Venters's testimony simply does not bridge the gap from an inference of negligence to an inference of conduct that is more than gross negligence to strip Dr. Theakston of qualified immunity.

The court turns next to Mr. Hammonds's lone case that he contends satisfies his burden of showing a clearly established right that Dr. Theakston violated, *Flowers v. Bennett*, 123 F. Supp. 2d 595 (N.D. Ala. 2000).

In *Flowers*, a deliberate indifference to medical needs case, evidence showed that the diabetic plaintiff told the jail medical staff that she needed a dosage of insulin the night she was booked into the jail. The staff did not give her any insulin. In the morning of her second day at the jail, she was hospitalized for diabetic ketoacidosis brought on, in part, by the jail staff's failure to provide her any insulin. From this evidence, the court found a genuine issue of material fact as to whether the jail officials knew that the plaintiff needed insulin but deliberately failed to provide her insulin. *Flowers*, 123 F. Supp. 2d at 601–02. So the court denied qualified immunity at the summary judgment stage. *Id.*

But *Flowers* does not support Mr. Hammonds's position. The case advises the court to deny qualified immunity when evidence shows that jail officials failed to give *any* insulin to a known diabetic inmate, which, unsurprisingly, could support an inference of the deliberate indifference to the inmate's serious medical needs. But no such evidence exists in this case. Unlike in *Flowers*, the issue in

this case is not whether Dr. Theakston provided Mr. Hammonds *any* insulin. Rather, the issue in this case is whether any evidence creates a genuine dispute of whether any reasonable medical official in Dr. Theakston's position would have known that giving Mr. Hammonds only short-acting insulin, as opposed to both short-acting and long-acting insulin, would violate Mr. Hammonds's clearly established rights. So *Flowers* does not change the court's qualified immunity analysis in this case.

Mr. Hammonds then ropes his post-hospitalization treatment at the jail into his § 1983 claim. According to Mr. Hammonds, Dr. Theakston's failure to perfectly follow the hospital's discharge instructions—by itself and/or combined with his pre-hospitalization treatment—strips him of qualified immunity. Again, the court disagrees.

After discharging Mr. Hammonds on October 8, 2014, the hospital instructed the jail to administer 70/30 insulin—a mixture of short-acting and long-acting insulin—twice a day, measure his blood glucose level three times a day, and administer regular insulin according to a sliding scale. (*See* Doc. 91-1 at 63). The jail mostly, but not perfectly, complied with these instructions.

A log of Mr. Hammonds's insulin dosages from his return to the jail on October 8, 2014 and his release from jail on October 16, 2014 shows that the jail medical staff missed one of the twice-daily doses of 70/30 insulin. (*See* Doc. 91-1

at 61) (entry for evening of 10/11/2014).  The staff once failed to measure his

blood glucose level.  (*See id.* at 61) (entry for midday of 10/12/2014).  The log has

no record of a regular insulin dosage on three occasions.  (*See id.*) (entries for

morning 10/9/2014, evening 10/11/2014, and midday 10/12/2014).  The staff did

not administer the correct dose of regular insulin on several occasions, usually

providing two units less or two units more than the hospital's sliding scale.  (*See

id.*) (for example, entries for evening 10/8/2014, evening 10/9/2014, morning

10/10/2014, evening 10/10/2014, and morning and midday 10/11/2014).  And, on

four occasions, the jail should have called the hospital because Mr. Hammonds's

blood sugar exceeded 400 mg/dl, but Dr. Theakston testified that he was not aware

if the jail ever did call the hospital.  (*See id.*) (entries for morning and midday

10/9/2014, morning 10/12/2014, and evening 10/15/2014).

Though the jail deviated from the hospital discharge instructions, no

evidence supports the inference that those deviations meet the substantially high

qualified immunity bar.  Dr. Venters testified about the risks involved with missing

insulin doses and not taking enough insulin, but his testimony does not show

whether Dr. Theakston violated an objective standard of care of which any

reasonable official in his position would have known by conduct that is more than

gross negligence.  No evidence shows that administering two units of R insulin

instead of four units, not going to the hospital with a blood glucose level exceeding

400 mg/dl, and missing one out of three insulin doses in a day is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Nam Dang*, 871 F.3d at 1280 (quotation omitted). So no genuine dispute of material fact exists as to whether Mr. Hammonds's post-hospitalization treatment strips Dr. Theakston of qualified immunity.

Finally, the court expresses concern with the quality of medical care that Mr. Hammonds received at the jail. The jail staff did not give Mr. Hammonds's condition all of the serious attention it deserved. Mr. Hammonds told everyone at the jail that he needed two types of insulin, but he only received one type of insulin and ended up in the hospital. And the jail staff was careless upon Mr. Hammonds's return to the jail by, assuming that the insulin log is accurate, neglecting to follow the hospital discharge instructions to the letter.

But the troubling deficiencies with Mr. Hammonds's medical care do not meet the substantially heavy burden to overcome qualified immunity under the Supreme Court and Eleventh Circuit precedent that the court has described throughout this opinion. So the court will grant the motion for summary judgment as to Dr. Theakston because of his qualified immunity.

2.    *Mr. Martin's Qualified Immunity*

Next, Mr. Hammonds asserts that Mr. Martin is liable for the alleged

deliberate indifference to his serious medical needs because, according to Mr. Hammonds, Mr. Martin (1) supervised Mr. Hammonds's care at the jail; (2) instituted a policy that caused the allegedly deficient medical care; and (3) threatened Mr. Hammonds and his family for calling 911.

To establish supervisory liability for a § 1983 claim, the plaintiff must show that "the supervisor personally participate[d] in the alleged unconstitutional conduct or . . . a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). And the plaintiff may establish the requisite causal connection "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (citations and quotations omitted).

Here, no evidence shows that Mr. Martin personally participated in Mr. Hammonds's medical care. And, because the court has found no genuine issue of whether Mr. Hammonds received unconstitutionally deficient medical care, no genuine issue exists of a causal connection between Mr. Martin's supervisory actions or policies and a constitutional violation. So Mr. Hammonds cannot strip Mr. Martin of qualified immunity under theories of supervisory or policy liability.

Finally, the court looks at Mr. Hammonds's most specific allegation against Mr. Martin—that Mr. Martin violated his Fourteenth Amendment rights by threatening him and his family for calling 911 and warning them against calling 911 again. The court assumes the truth of Mr. Hammonds's testimony about the events surrounding the 911 call, but no evidence supports a reasonable inference that Mr. Martin's actions violated clearly established law.

As stated above, to show that a defendant violated the plaintiff's clearly established right to be free from the deliberate indifference to his serious medical needs, the plaintiff must show that the defendant's conduct caused the plaintiff's injury. *Goebert*, 510 F.3d at 1326. Here, no evidence shows that Mr. Martin's threats to Mr. Hammonds and his family caused any injury or had any effect on Mr. Hammonds's medical treatment whatsoever. No evidence shows, for example, that Mr. Hammonds or his family called 911 again and suffered consequences from Mr. Martin, or that Mr. Hammonds or his family needed to call 911 for a medical emergency but could not because of Mr. Martin's threats. So no genuine dispute of material fact exists as to whether Mr. Martin's threats to Mr. Hammonds and his family concerning 911 violated Mr. Hammonds's clearly established Fourteenth Amendment rights.

## IV.  CONCLUSION

For the reasons stated above, by separate order, the court will **GRANT**

Defendants' motion for summary judgment on the grounds of each Defendant's qualified immunity. (Doc. 80). Summary judgment is appropriate even when considering Mr. Hammonds's expert witness's testimony, so the court will **DENY** Defendants' motion in limine to exclude that testimony. (Doc. 83). And the court will **DISMISS** this case **WITHOUT PREJUDICE**.

**DONE** and **ORDERED** this 20th day of September, 2019.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE